STATE OF NEW MEXICO

FIRST JUDICIAL DISTRICT

COUNTY OF SANTA FE



FILED
FIRST JUDICIAL
DISTRICT COURT

2016 APR 21 PM 12: 14

D-101-CV-2016-01056

HEATHER BURKE [Pro Se],

    Plaintiff,

v.

STATE OF NEW MEXICO,

EDWYNN BURCKLE, in both official and individual

capacities as Secretary of the General Services Department

JAY HONE, MICHAEL GALLEGOS, ANGELA DAWSON, BRENDA GUETHS, AND KAREN BALTZLEY

In their individual capacities,

    Defendants.

## VERIFIED COMPLAINT FOR VIOLATIONS OF
## THE FAIR PAY FOR WOMEN ACT,
## THE NEW MEXICO WHISTLEBLOWER PROTECTION ACT,
## AND 42 U.S.C §1983

### I.    Nature Of The Action

COMES NOW Heather Burke, Pro Se, to complain against the Defendants for violations of the New Mexico Whistleblower Protection Act, NMSA 1978 § 10-16-1 *et seq.* (2010) ("NMWPA", herein), for violations of the Fair Pay for Women Act, and for violations of Ms. Burke's Civil Rights. Ms. Burke, a public employee of the New Mexico General Services Department ("GSD"), reported to her superiors and to

others information about actions and inactions by other public employees that she believed, in good faith, constituted malfeasance in public office, violations of state law and administrative code, gross misconduct and gross mismanagement of staff and public funds, and abuses of authority. She simultaneously reported violations of her Civil Rights, and questioned her gender based pay disparity to her superiors and to others. In response to these reports, the Defendants retaliated against Ms. Burke by decreasing work responsibilities, assignments, benefits, income and creating and maintaining a hostile work environment that has been incredibly damaging to Ms. Burke.

Ms. Burke was concerned that the actions, inactions and behavior of Maurice Bonal, Jr. ("Mr. Bonal") put sensitive personal information entrusted to GSD at risk of theft, exposure, or other breach that could result in great harm to all those affected, and thereby was of great public concern. Ms. Burke reported numerous examples of these security violations which were in direct violation of the GSD code of conduct, as well as the State Administrative Code and the professional ethics of anyone entrusted with these responsibilities. Ms. Burke also believed that she had the right to be able to do her job without fear of physical and/or emotional harm when she had to question or disagree with Mr. Bonal who would lean in towards her in a threatening manner, face purple with rage, and raise his voice, among other physically threatening behavior, when she did so. Ms. Burke always felt as though she never knew when Mr. Bonal was going to snap.

GSD failed to investigate these complaints, and instead, began a steadily increasing pattern of retaliation that went so far as to use Ms. Burke's temporary knee

disability and her later battle with Breast Cancer as tools to further harm her. Ms. Burke's work environment changed drastically as soon as she made her complaint. Mr. Bonal seemed to be considered immune from any and all accountability by GSD management, and they completely refused to investigate or address the harassment Ms. Burke suffered, repeatedly trying to deny even having knowledge of it. Ms. Baltzley downplayed Ms. Burke's complaints, referring to them as "sibling rivalry" and trying to make it appear that Ms. Burke just didn't like Mr. Bonal and how he did things. Signing off on having secured servers, while not actually having done so, is not a "way of doing things".

Ms. Baltzley, herself, has little technical skill or more than a high level understanding of technology, so she is unable to properly assess areas of risk or impact. After Ms. Burke's complaint, Ms. Baltzley turned to Flaviano Prosperini ("Mr. Prosperini") to provide information that she should be asking her system administrators for, to report on the activities of his coworkers, and to work on projects outside the scope of his level of skill and job duties. This was a violation of security because it created no oversight to important changes being made, increased the chance of serious mistakes and could easily result in abuses. It also pitted Mr. Prosperini against Ms. Burke, creating an even more hostile work environment.

Right after making her complaint, Ms. Burke was excluded from all meetings and planning for a project that was later used as cause for disciplinary action for an oversight made when Ms. Burke felt forced to work a 22-hour day in an attempt to complete said project without having been provided any of the support or information from those meetings. Ms. Burke was also purposefully excluded from many other

projects and duties after making this complaint, and she began to see a dangerous pattern emerge in ignoring the division of duties necessary to maintain an appropriate level of security. Mr. Prosperini, an application developer, was repeatedly used to avoid involving Ms. Burke in projects that were part of her job responsibilities, and also to avoid having to hold Mr. Bonal to the requirements of his position. This gross mismanagement of staff put, and continues to put, the sensitive personal information of state employees and their dependents at great risk, which later resulted in what Ms. Burke believes to be the theft and/or exposure of a large amount of personal and health information, including her own.

Ms. Burke frequently reported her increasingly hostile work environment to her superiors and HR, but no action was taken to remedy it. Reporting these problems, and her continued harassment, resulted in several disciplinary actions for Ms. Burke. One of these took place at a meeting that was supposed to be about her request for accommodation. This accommodation was being sought by Ms. Burke because the retaliation and hostility was damaging her health, and she sought to have her office moved to a less hostile location. Instead, she was disciplined for insubordination, and was sent home on administrative leave for 2 days while an internal security audit was conducted. Mr. Bonal was informed of this audit, but it was purposefully kept secret from Ms. Burke.

Ms. Burke realized that GSD intended to do nothing about her complaints, and she began to feel vulnerable to the lengths that GSD would go to silence and discredit her. Ms. Burke filed a complaint with the EEOC and hoped that it would encourage

GSD to take her concerns seriously. Within days, GSD gave Ms. Burke an official letter stating her complaints had never, in their view, even happened.

Several weeks later, Ms. Burke was suddenly and unexpectedly diagnosed with Stage 3 Breast Cancer, which is a Cancer that has been correlated to Chronic Stress. Ms. Burke was hopeful that GSD would cease their retaliation and that they would step back and allow her to deal with the devastating and difficult road that lay ahead for her. Unfortunately, GSD only increased their retaliatory and hostile behavior, making things as difficult as they could for Ms. Burke; violating her rights as a classified state employee, as well as State and Federal Law to do so.

Ms. Burke was shown absolutely no compassion, and was constantly terrorized by GSD's retaliatory behavior that she feared would result in her termination and losing her benefits at the time her very life depended on having them. She continued to uncover numerous security issues that she dutifully reported, and was continually retaliated against for reporting these discoveries. While actively undergoing Chemotherapy, Ms. Burke was given duties that violated her FML protections and her Doctor's orders, instead of giving them to staff that would have been a more appropriate and logical choice. With full knowledge of everything Ms. Burke was enduring, GSD refused to lessen their disparate and impossible standard for Ms. Burke's work, while simultaneously accepting much less from those not fighting Cancer. One such assignment resulted in injury that may have resulted in what will be a life-long battle with Lymphedema for Ms. Burke.

Although Ms. Burke tried her best to seek help from within GSD when these problems arose, she was not successful in preventing the continuing retaliation and

hostility that had become blatantly obvious to nearly all employees of GSD. Despite Ms. Burke's Chemotherapy regimen, she still managed to outperform her peer, Mr. Bonal, in amount of work completed. At several times during the month of May, Ms. Baltzley seemed to purposefully bait Ms. Burke into reaction with blatant violations of her privacy and defamation of her character. Chemotherapy is an extremely difficult experience mentally, emotionally and physically, which naturally makes someone less able to avoid provocation and emotional response. Ms. Burke filed an additional charge at the EEOC for discrimination, harassment and retaliation on the basis of Cancer at this time.

When Ms. Burke was placed under investigation at the beginning of June for an oversight she made almost exactly a year before, Ms. Baltzley's intentional provocation made sense. Ms. Baltzley had been artificially trying to create enough accusations against Ms. Burke to terminate her. Sure enough, along with the trumped up violation of security charge against her, there were 3 charges of insubordination for the instances when Ms. Burke had confronted Ms. Baltzley for her violations of privacy and defamation of character. The testimony against her was given by Mr. Bonal and Mr. Prosperini, despite their obvious animosity towards Ms. Burke. Mr. Prosperini went so far as to testify as to what was said during a phone call that he was not even a party to, while Mr. Bonal claimed to have found the alleged infraction by Ms. Burke when he "accidentally typed in the wrong window on Bing and it just came up". Another individual, Marcus Gee, who regularly interacted with Ms. Baltzley but was someone with whom Ms. Burke had met in passing only a couple of times, somehow had particularly terrible things to say about Ms. Burke's character.

Although GSD contends that Ms. Burke's mistake was catastrophic, they took 40 days to change the password that was allegedly revealed, demonstrating without a doubt that they did not actually consider this to be a serious security issue.

Although this trumped up charge was the only time the quality or content of Ms. Burke's work had ever been called into question, and no one else in the department had ever been held accountable for their mistakes or purposeful violations of polices and NMAC, Ms. Burke was eventually suspended for one month without pay. In violation of NMAC rules, GSD did not state when this suspension would take place. The stress of these events at the same time as her Chemotherapy caused Ms. Burke to start experiencing debilitating Anxiety and Panic attacks. Ms. Burke and her doctors decided that to give Ms. Burke the best chance of surviving the rest of her treatment, she would take Short Term Disability leave during her radiation treatment.

Ms. Burke was not sure at what point her FML covered leave would expire, so she began asking HR to provide her timesheets so that she could check how many hours she had left, but no timesheets were provided. Weeks later, Ms. Dawson notified Ms. Burke that she had 1.5 days left, which violated FML notice requirements. Ms. Burke asked whether she should make plans to return to work the next week. Ms. Dawson responded that Ms. Burke could not return to work, and would need a Doctor's note when she did. The next business day, Ms. Burke was issued a Notice of Contemplated Action for a Separation Without Prejudice that accused her of being "too sick to work". This came only 4 hours after Ms. Burke's FML had run out, assuming Ms. Dawson's calculations were correct.

Despite submitting certification of her ability to return to work, GSD spent a month deciding whether Ms. Burke could return. She gave an Oral Response to this notice, during which she was told by Jay Hone that she had stated in her STD application that she was "unable to work in any capacity". Although Mr. Hone is General Council for GSD, and used to work directly for the Risk Management Division, he was blatantly unaware that the GSD STD Policy REQUIRES the statement that a person is "unable to work in any capacity" in order to qualify for benefits. Ms. Burke responded that this was the requirement, and asked if that meant that she was actually being fired for making use of a benefit that GSD itself offered to all state employees?

It took two more weeks for GSD to decide to revoke their contemplated action, despite the fact that it was obviously in violation of numerous rights and erroneous in nature. During their contemplation, they paid Ms. Burke using the leave that her generous coworkers had donated, which was required to be used only for Ms. Burke's cancer battle, but was fraudulently used to facilitate and fund GSD's illegal actions. When GSD finally made contact with Ms. Burke through her union, they attempted to require Ms. Burke to drop her complaints of illegal treatment in order to be returned to work. Ms. Burke flatly refused, and GSD decided to change her suspension to a week without pay and return her to work.

However, GSD still had no intention of stopping the illegal retaliation and hostility with which Ms. Burke was treated. Upon her return to work, Ms. Burke's office was moved into what had formerly been a closet, and her job duties and responsibilities were stripped. They denied the medical accommodation from Ms.

Burke's Doctor to move her to a less stressful and hostile environment. Despite pretenses that Ms. Burke would retain approximately 33% of her former responsibilities and duties, it became clear that GSD purposefully intended to continue to prevent Ms. Burke from doing the job that the taxpayers paid for her to do. Ms. Burke was no longer allowed to work independently in the field or do any of her desktop duties, which Ms. Baltzley knew to be Ms. Burke's strongest area and favorite part of her job. She was told she couldn't even be physically in offices she had always supported. Ms. Burke continually implored Ms. Baltzley to restore her job duties and reduce the stressful environment that was so damaging to her health. Ms. Baltzley ignored Ms. Burke's pleas.

While suffering from this unbearable treatment, Ms. Burke discovered still more security problems. During Ms. Burke's absence, Ms. Baltzley had tasked Mr. Prosperini with moving a systems administration tool to a new server. Although this was clearly the job of a system administrator, Mr. Prosperini accepted this assignment and moved this software. Unfortunately, because he did not know what he was doing, he left this tool open to anonymous logon for months, until Ms. Burke discovered and reported this breach of security. The tool in question, Lansweeper, contained everything about the internal infrastructure with the exception of passwords. This was exactly the kind of security violation Ms. Burke had reported and expressed concern about in the past when the proper division of skill and responsibilities were not followed at GSD.

No response from GSD was forthcoming from Ms. Burke's concern about this security breach, so she started to do some exercises using the information that could

be obtained from this tool. To her horror, Ms. Burke discovered that GSD was storing tons of private information on the public facing FTP server. This information included copies of Social Security cards, Birth certificates, Driver's licenses, as well as that information on various other forms, which could quite easily be accessed with the information that was available from Lansweeper. Ms. Burke again reported this and still GSD did not react except to remove this info. Ms. Burke continually pushed for an investigation to be done so that the level of possible damage could be assessed and measures could be taken to secure everything. There was no way to tell what info may have been accessed and/or stolen, and doing a proper investigation would at least demonstrate that GSD was taking this seriously.

A month or so after Ms. Burke had found and reported this issue, on her way out to her car one evening she discovered a piece of paper that had her own name on it. It also had her SSN, DOB and medical diagnosis of "Breast Cancer". It contained this same information for 20 or so other people. It appeared to be a database output of some kind, with obviously more pages than just the one Ms. Burke had found. Ms. Burke reported to Ms. Baltzley that she had more reason to be concerned about her earlier report and wondered what GSD had done to investigate it. Ms. Baltzley did not ask what Ms. Burke had found. It was then that GSD finally issued a response that they had not investigated Ms. Burke's finding at all, because they considered it a "configuration issue" rather than a security breach.

Despite the possible magnitude of what Ms. Burke had uncovered, GSD hadn't even done any investigation to assess it. The potential breach that Ms. Burke herself was accused of that GSD <u>did</u> investigate was nothing compared to what had been

10