from. Ms. Dawson told her that instead GSD had decided that she might take extra breaks, but that her breaks must all be logged. GSD does not have the medical expertise to contradict and substitute a Doctor's medical order. Also, no other GSD employee is required to log breaks. At the time of this request, there were at least 8 empty offices around GSD that Ms. Burke could have been relocated to at no cost to GSD.

196. Ms. Burke has been told that she could not only no longer support the Risk Management Division at all because of her EEO complaints, and she was no longer even physically allowed there. Lara White Davis communicated to Brian Walker that Ms. Burke could no longer be at his desk in RMD. Mr. Walker sent Ms. Burke a text message communicating this to her.

197. On 11/4/2015 Ms. Burke reported this retaliation to HR and asked that they have an independent investigation into her being illegally stopped from going where she went and interacting with whom she interacted, before her protected activity and that people are being told not to interact with Ms. Burke. Ms. Dawson decides to do her own "investigation" despite her obvious conflict of interest. She summoned Brian Walker to HR, and then, not surprisingly, determined that no retaliation had taken place  This event scared Mr. Walker so much that it destroyed their friendship. He later told Ms. Burke that he wanted nothing more to do with Ms. Burke because "She was going to get him fired". For some reason he was made to believe that Ms. Burke had set him up and had intentionally had him sent to HR. He unfriended Ms. Burke on the game network where they used to play together.

This further isolated Ms. Burke at work, and no one interacted with her anymore.

198. Mr. Bonal also successfully brought suit against the State for violations of the NMWPA. During the entire course of his lawsuit, his duties remained nearly completely unhampered and unchanged, and he was, and is, allowed to go where he would like in GSD. He supported Risk Management throughout the lawsuit, including, but not limited to, creating an active directory account for RMD Director AJ Forte and working with Lara White Davis' legal files and folders. During his active lawsuit, he completed at least 242 tickets for the Risk Management Division.

199. On or about 11/16/15 Ms. Baltzley told Ms. Burke the reported breach was only a "potential breach and so not worth making a big deal about". Ms. Burke asked her why her own alleged breach, which was also a "potential breach" with FAR less consequences possible stemming from it, was treated so severely? Ms. Baltzley did not answer.

200. Ms. Burke discovered that a huge amount of state employee's private information, including copies of birth certificates, social security cards and driver's licenses were being stored unsecured on the public facing FTP server that because of technical issues did not even have anti-virus on it since Mr. Bonal had built it 2 years before. It also had the default administrator account active, with full access to all of the information in the files. As is the case with most public FTP servers, this server was constantly under attack from places like Russia, Korea, etc, to try to gain access.

201. On 11/18/2015 Ms. Baltzley was not in the office, so Ms. Burke reported this discovery to RMD Director, AJ Forte, hoping that she could avoid yet another stressful whistleblowing moment with management. Ms. Burke sent Ms. Baltzley a 3rd request for info on how they are handling this breach and informed her that Ms. Burke had even more reason to be concerned. She responded to Ms. Burke she is waiting for "final approval" on the resolution letter and hoped to send it out the next day. Ms. Baltzley did not ask Ms. Burke what her concerns were.

202. Ms. Burke continued to send Ms. Baltzley emails asking to be assigned work and asking for her job duties and responsibilities to be restored.

203. 11/24/15 Ms. Burke finally received the official response to her security concern. Ray Shoulla declares that the Lansweeper issue is a "configuration issue" not a "security threat". GSD had just provided almost ALL internal network info, local accounts, software installed, IP addresses, and more for months to anyone who connected to the unsecured internal network. This would provide enough information that even an incompetent hacker or bored employee could use to gain access to internal private information, with NO way to tell that they had accessed it. The technical explanation given for not investigating this breach was inaccurate and made light of some very serious concerns. Ms. Burke responded stating this and also asked again why this potential breach is not serious, but her potential breach was? Why was Ms. Burke treated so differently from her peers?

204. Ms. Burke discovered a paper out in the parking lot that caught her eye because it had her name on it. It turned out to contain her name, DOB, SSN, and medical diagnosis of breast cancer, along with over 20 or so other people's similar details. It looked to be a CSV output from a database and Ms. Burke was concerned that it represented the fact that this information had been exposed. As she found only one page of what appeared to be a multi-page document, Ms. Burke remains concerned that more similar data has been exposed and/or stolen.

205. Ms. Baltzley did not ask to see the document found by Ms. Burke until 12/4/2015, again demonstrating her lack of concern for security issues and lack of respect for Ms. Burke's job role.

206. On 12/08/2015 Ms. Baltzley put Ms. Burke in charge of the FTP project. Ms. Burke scheduled it to be the weekend of 12/19/15. Two days before it is to happen, Ms. Baltzley canceled it without involving Ms. Burke, and ordered that it should instead happen in January. Ms. Burke asked her why she had not involved Ms. Burke in managing the project that she was assigned to be in charge of. Ms. Baltzley did not answer.

207. On 12/17/15 Ms. Burke ask for clarification of her duties again, as Ms. Burke was assigned no work and Ms. Baltzley replied telling Ms. Burke "soon".

208. Ms. Burke emailed Ms. Baltzley again, and stated that it had now been 3 months since her return, and her job duties were still stripped and she was still assigned no work. The taxpayers were being made to pay for work they were

not getting. Ms. Burke had also been completely isolated in the closet office, where weeks would go by with no one talking to her.

209. On 1/5/2016 Risksense started an investigation of the FTP server. Ms. Burke was again excluded from knowledge or involvement in addressing a serious security issue she discovered in the course of her duties. This is undoubtedly why the FTP project had been cancelled and yet Ms. Baltzley, as usual, refused to share necessary information with Ms. Burke. Risksense left their highly privileged account logged in, creating yet another security vulnerability. They also make uncommunicated changes to the server infrastructure, which later resulted in Ms. Burke having to give up an entire Saturday to remedy. Ms. Burke has not been made aware of the results of this investigation, despite her professional and personal involvement.

210. On 1/8/2016 Ms. Burke sent Ms. Baltzley another email, stating that 3 months had passed since she had been allowed to work. She urged GSD to restore her job duties, and cease the obvious retaliation, stating that the immense stress it was causing would exponentially increase the chance her cancer would return. Ms. Burke also reported to Ms. Baltzley in that email that her coworkers had begun turning the lights off on Ms. Burke at the end of the day in an extremely hostile behavior. Ms. Baltzley did not respond to this email, nor were Ms. Burke's job duties restored. Three months later, Ms. Burke's body started showing signs of cancerous or pre-cancerous changes.

211. The blatant workplace hostility continued and Ms. Burke finally sent an email reporting it to HR and stated that Mr. Prosperini was the individual

engaging in this hostile behavior under pretext that he didn't know Ms. Burke was in her office. Ms. Dawson again failed to follow GSD complaint resolution policy which stated that Ms. Burke would be met with informally to discuss her concerns. Ms. Dawson responded, with no interview or request for detail of the hostile activity, that she saw no inherent hostility in Mr. Properini's actions. Ms. Burke questioned Ms. Dawson's conflict of interest in conducting a fair investigation, and wondered how she could make an assessment with no interview. Ms. Burke asked to file an official complaint as was the next step of the complaint resolution process and Ms. Dawson ignored this request. A couple of weeks later, Ms. Burke saw Ms. Dawson out to lunch with Mr. Prosperini.

212. On 1/29/16 Ms. Burke sent another email to Ms. Dawson and Ms. Baltzley about her lack of job duties stating that no reason had been given for her obvious demotion and mentioning that it had been 2 months since Ms. Baltzley had even spoken to Ms. Burke. Ms. Burke stated the other IT Generalist 2, Mr. Bonal was still allowed to do his full duties and Ms. Burke questioned why she had been singled out. There was no response to this email.

213. On 02/9/2016 Ms. Burke's annual review for the period 18 months in the past was conducted for the EDA that was opened on 8/8/2014. Ms. Burke was negatively reviewed for failing to be productive. Ms. Burke questioned this, as she could prove that she had completed approximately 30% more work during active cancer treatment than her healthy coworker, Mr. Bonal had done in that same time period. The next week, Ms. Baltzley issued Ms. Burke

66

another version of the review this time saying her ability to produce was suddenly ok. The new review had the old review's signature pages and not been re-signed, which seemed strange to Ms. Burke. Ms. Burke was still negatively reviewed for "poor communication" because Ms. Burke did not interact much with two of her coworkers: Mr. Bonal, who Ms. Burke had been harassed by, and Mr. Prosperini who has given false testimony against Ms. Burke and had recently been engaging in very hostile behavior toward her. The fact Ms. Burke had great communication with all the 350 or so others employees didn't count in this assessment, for reasons that remain unclear. When pushed for examples of this failure to communicate, Ms. Baltzley gave examples that were not from during the time Ms. Burke was being reviewed for, instead she gave recent examples which should not have applied to the review period.

214. GSD revokes the remaining 29 hours of donated annual leave that Ms. Burke has not yet used after Ms. Burke started asking for FML forms for her upcoming surgery. HR tells Ms. Burke that she's had the leave too long and she returned to work from Short Term Disability months before. Ms. Burke states that STD has nothing to do with a leave donation, the leave was needed for her cancer treatment, which was still ongoing. GSD policy and SPB rules both indicate that donated leave will be forfeit only when the medical issue is finished, or when the employee notifies them that leave is no longer needed. There is no mention of time restrictions.

215. On or about 03/2016 Ms. Burke is denied FML and told that she does not

meet the 1250-hour requirement. She is told that 3 HR employees have double checked these numbers, and that's the way it is. Ms. Burke spends hours manually adding her own time, and discovers that she does indeed qualify. HR provides no explanation for why 3 different HR staff members, including HR Director Angela Dawson, are unable to correctly add Ms. Burke's worked time or assess her eligibility to qualify for FML protection.

216. On 3/28/16 Ms. Dawson sends a letter stating that Ms. Burke has been approved for a temporary work from home accommodation while she is recovering from surgery. Ms. Burke returns from surgery leave earlier than originally expected because she has been told she must have another surgery for possible recurrence. The same day she returns to work, Ms. Dawson requests an update for her accommodation, even though it has only been a week since approval and Ms. Burke has only been active for 1 day.

217. Ms. Dawson sends an email to Ms. Burke telling her that GSD will contact her provider for information, even though this was not the same provider who filled out the accommodation paperwork. Ms. Burke asked why so many updates were needed when she is only halfway through a 2-week accommodation.

218. On 04/13/2016 Ms. Baltzley sends an email requesting Ms. Burke work on a desktop WSUS project, even though she is not working on desktops anymore. Ms. Burke states that as she has been prevented from working for nearly a year, she has no idea what the existing settings are anymore, as things are never communicated. Ms. Baltzley admonishes her, stating that this has

been Ms. Burke's "responsibility" for years. Ms. Burke does not even have an active EDA anymore, so as Ms. Burke has stated in numerous emails for months, Ms. Burke has no idea what she is responsible for, and it seems to change by the day, as convenient for Ms. Baltzley. She again re-iterates her concern of the hostility, retaliatory treatment and emotional abuse that has constantly been her work environment. She also states again her concern with the impact on her health, the correlation between it and the possible return of her cancer necessitating another invasive surgery, and the fact she feels trapped by needing income and benefits while the illegal workplace treatment slowly kills her.

219. On 04/13/2016 Ms. Burke discovers Mr. Bonal is working on a project to replace the VMware hosts. No mention of this is made to Ms. Burke, nor is she included in this activity, despite being told she was responsible for servers. She learns of it from a third party.

220. Ms. Burke cancelled her arbitration after being told about her upcoming surgery and the fact the arbitration would cost her thousands. There was just no way to be able to handle all of it. No information about arbitration was provided, nor did there seem to be any way to appeal without incurring such high costs, which seems very wrong. It did not appear that arbitration would have been able to address the real reasons for the disciplinary action, which is what this complaint hopes to achieve.

221. Regardless of all of the misconduct and security violations numbering in the hundreds that Ms. Burke has discovered and reported, many of which were

purposeful, Ms. Burke is the only employee in her department to be investigated and formally disciplined.

222. Ms. Burke has been told by coworkers that they are afraid to be seen with her, that now they will "just keep their heads down" and ignore whatever is happening in their own respective situation at work.

223. On the rare occasions that other GSD employees see Ms. Burke, jokes about her being on "work release" and her having had her "ankle monitor removed" are common.

224. Ms Burke's health, professional reputation and career have been irreparably damaged by the retaliatory treatment she has received.

225. GSD has been well aware that Ms. Burke's continuing treatment has made it difficult to impossible to seek other employment opportunities, and yet they have actively tried to make Ms. Burke as miserable as possible while she has simultaneously been fighting for her life.

226. Ms. Burke has recently been told that changes in her body might be cancer again, or pre-cancer. Now she faces another emotionally difficult and invasive surgery with a long recovery.

### First Count: Violation of the Fair Pay for Women Act

227. Ms. Burke incorporates and re-alleges by reference each and every allegation set forth in the paragraphs above.

228. Ms. Burke is employed by the State of New Mexico as an IT Generalist 2 at a salary of $70,324.

229. Mr. Bonal is employed by the State of New Mexico as an IT Generalist 2 at a salary of $76,815.

230. Ms. Burke and Mr. Bonal have had the exact same job duties, which require equal skill, effort, and responsibility and are performed under similar working conditions. Their positions are officially interchangeable. Ms. Burke is, simply put, paid less to do the exact same work as Mr. Bonal.

231. The State of New Mexico General Services Department does not pay pursuant to any seniority, merit or quantity/quality of production system.

232. GSD has no legitimate, non-discriminatory business reason for failing to pay Ms. Burke equitably as required by law. Any reasons put forward by Defendants are but pretexts for unlawful discrimination.

233. Since complaining of unequal treatment and engaging in protected activity, Ms. Burke has been stripped of her job duties and is no longer assigned meaningful work in violation of state and federal laws against retaliation.

234. As a direct and proximate result of the failure of the Defendants to address these issues, and the retaliatory action taken against Ms. Burke for reporting them, Ms. Burke suffered, and continues to suffer, damages as set forth above and below and incorporated herein by reference.

## Second Count: Violation of the New Mexico Whistleblower Protection Act

235. Ms. Burke incorporates and re-alleges by reference each and every allegation set forth in the paragraphs above.

236. Ms. Burke was at all relevant times, and still is, a public employee within the meaning of the New Mexico Whistleblower Protection Act (See Section 10-16C-2B)

237. State of New Mexico General Services Department is a public employer within the meaning of the New Mexico Whistleblower Protection Act. See Section 10-16C-2(C)(1)

238. Secretary Burckle is a public employer within the meaning of the New Mexico Whistleblower Protection Act. Section 10-16C-2(C)(4)

239. As alleged above, Ms. Burke communicated to her employers and third-parties information about actions and failures to act on the part of her employers, her supervisor, Ms. Baltzley, and coworkers Mr Bonal and Mr. Prosperini, that Ms. Burke believed in good faith constituted malfeasance in public office, violations of state law, state administrative rules, internal policy, gross mismanagement, a waste of public funds, an abuse of authority and substantial and specific danger to the private information of all state employees as described above.

240. GSD has acknowledged and officially stated in their EEOC position statement that Ms. Burke engaged in Whistleblower activity.

241. Ms. Baltzley, in her acts and omissions as alleged above, ensured that facts reported by Ms. Burke were obscured, downplayed and falsified when "investigated" to appear to be less than they were, damaging Ms. Burke's credibility and reputation, causing emotional distress and allowed gross violations of security and state administrative code to continue unhampered.

242. By their acts and omissions as alleged above, GSD, Secretary Burckle, Ms. Baltzley, Mr. Gallegos, Ms. Dawson, Mr Hone and Ms. Gueths all took retaliatory action against Ms. Burke because of these communications, in violation of the Whistleblower Protection Act. See Section 10-16C-3

243. As a direct and proximate result of GSD, Secretary Burckle, Ms. Baltzley, Ms. Dawson, Mr. Gallegos, Mr Hone and Ms. Gueths violations of the New Mexico Whistleblower Protection Act, Ms. Burke suffered, and continues to suffer, damage including, but not limited to, wrongful termination, retaliation, lost income, defamation of character and reputation, damage to her physical health, worry, stress, humiliation, and/or emotional, mental and psychological distress.

## Third Count: Violation of Civil Rights - 42 U.S.C. § 1983

244. Ms. Burke incorporates and re-alleges by reference each and every allegation set forth in the paragraphs above.

245. The Defendants, in their individual capacities, at all relevant times, acted "under color of state law" as Public Officials and State of New Mexico Employees and Contractors to deny Ms. Burke her constitutional right to equal treatment based on gender under the 14th Amendment of the Constitution of the United States of America.

246. On information and belief, the Defendants, in their individual capacities, knew of the discriminatory difference in pay between Mr. Bonal and Ms. Burke, and yet chose not to remedy this violation of equal pay and treatment.

247. On information and belief, the Defendants, in their individual capacities, chose not to investigate or officially acknowledge Ms. Burke's complaints of gender based harassment, and allowed it continue without remedy for over 3 years from the time Ms. Burke first reported Mr. Bonal's behavior to Ms. Baltzley until the time of this complaint.

248. On information and belief, Secretary Burckle, in his individual capacity, failed to properly train and discipline his staff in all matters in connection with violations of Ms. Burke's constitutional rights.

249. On information and belief, the Defendants, in their individual capacities, all took action to retaliate against Ms. Burke for reporting these violations both internally and to 3rd parties.

250. On information and belief, the Defendants, in their individual capacities, were aware of the damage to Ms. Burke's health that the harassment, retaliation and resulting hostile work environment caused, and still chose not to act. This demonstrates that the violation of Ms. Burke's constitutional rights was intentional, and also demonstrates a reckless disregard for the damage this violation caused.

251. The 14th amendment and the Fair Pay for Women Act/Equal Pay Act are clearly established laws of our land, and that which a reasonable person in the Defendants' position would be expected to know.

252. As a direct and proximate result of the failure of the Defendants to address these issues, and the retaliatory action taken against Ms. Burke for reporting

them, Ms. Burke suffered, and continues to suffer, damages as set forth above and below and incorporated herein by reference.

### Fourth Count: Violation of Civil Rights - 42 U.S.C. § 1983

253. Ms. Burke incorporates and re-alleges by reference each and every allegation set forth in the paragraphs above.

254. The Defendants, in their individual capacities, at all relevant times, acted "under color of state law" as Public Officials and State of New Mexico Employees and Contractors to deny Ms. Burke her constitutional right to privacy under the 4th Amendment of the Constitution of the United States of America.

255. As alleged above, Ms. Baltzley, in her individual capacity, repeatedly disclosed information pertaining to Ms. Burke's medical condition, treatment, medical accommodation, disciplinary action and other private details with coworkers, contractors and the general public.

256. Secretary Burckle, Angela Dawson and Jay Hone, in their individual capacities, on information and belief, were aware of these violations of Ms. Burke's constitutional right to privacy, demonstrated deliberate indifference, and failed to provide training or discipline to Ms. Baltzley to prevent reoccurrence of these constitutional violations.

257. On information and belief, Secretary Burckle, in his individual capacity, failed to properly train and discipline his staff in all matters in connection with violations of Ms. Burke's constitutional rights.

258. As alleged above, the Defendants, in their individual capacities, failed to protect Ms. Burke's and other State of New Mexico employees and dependents private health and personal information, despite Ms. Burke's repeated reports and warnings of security issues, violations of NMAC, and gross mismanagement of technical staff that she feared would lead to just such an occurrence.

259. The 4th Amendment's right to privacy is a clearly established law of our land, and that which a reasonable person in the Defendant's positions would be expected to know.

260. As a direct and proximate result of the failure of the Defendants to address these issues, and the retaliatory action taken against Ms. Burke for reporting them, Ms. Burke suffered, and continues to suffer, damages as set forth above and below and incorporated herein by reference.

## Damages

Ms. Burke respectfully requests that this Court enter judgement in her favor and against the Defendants, awarding her:

261. Damages resulting from the Defendants' violations of the New Mexico Whistleblower Protection Act

262. Damages in the form of Mental, Emotional and Psychological Distress and Special Damages for all violations.

263. Punitive Violations for the violation of the Fair Pay for Women Act.

264. Punitive Damages as allowed by §1983 for the malicious and/or recklessly indifferent violations of Ms. Burke's civil rights and the retaliation, and specifically the timing of said retaliation, for reporting them.

265. Damages in the form of Front pay for irreparable damage to Ms. Burke's career and reputation.

266. An order requiring the removal of all disciplinary and other related information from Ms. Burke's personnel file.

267. An order requiring GSD to return to GSD employees all of the donated annual leave that was misused during the adverse actions against Ms. Burke.

268. An order that Defendants be held accountable to the same disciplinary standards as any other employee would be, up to and including termination, for willful violations of State and Federal Law, NMAC and internal policy. If a normal employee would be terminated for these heinous acts, so too, should the Defendants be.

Ms. Burke further requests that all issues of fact in this case be presented to a jury of twelve persons.

Respectfully Submitted.

*Heather Burke* (signature)

Heather Burke
2268 Calle Cuesta
Santa Fe, NM 87505
(505)449-8833
hbobloblaw@gmail.com

## VERIFICATION

STATE OF NEW MEXICO )
                          )ss:
COUNTY OF SANTA FE )

      I have read the contents of the attached complaint for violations of the Fair Pay for Women Act, the New Mexico Whistleblower Protection Act, and U.S.C. §1983. The contents of the complaint are true and correct to the best of my knowledge.

*Heather Burke* (signature)

Heather Burke

      Before me appeared Heather Burke to subscribe and swear to the forgoing statement on April 21, 2016.

*Paula Salazar* (signature)

Notary Public

My Commission Expires: June 10, 2016

